## S12A1626. JONES v. THE STATE.
### (740 SE2d 590)

BLACKWELL, Justice.

Tchywaskie Lamar Jones was tried by a Dougherty County jury and convicted of aggravated assault and a violation of the Georgia Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq., in connection with a shooting at a public pool in Albany in which a bystander was wounded. Jones appeals and raises several claims of error, including that the evidence is insufficient to sustain his convictions and that the trial court failed to respond as required by OCGA § 17-8-75 when the prosecuting attorney spoke in his closing argument of facts outside the record.[1] We agree that the evidence is insufficient to sustain the conviction for violation of the Street Gang Act, and we agree that the trial court failed to fulfill its obligations under OCGA § 17-8-75. For those reasons, we reverse the judgment below.

1. Viewed in the light most favorable to the verdicts, the evidence shows that on June 16, 2009, Sequoia Jefferson went to a crowded public swimming pool in Albany, accompanied by at least four other women and their children, including Jefferson's infant son. Around 6:00 p.m., as Jefferson and her companions were waiting to be admitted into the pool, they were approached by another group of women, and an altercation occurred. An unidentified woman apparently attempted to strike the woman who was carrying Jefferson's son, and she struck the baby instead. Jefferson called the baby's biological father, Dabkowski Luke, and told him of the assault.

About 30 minutes later, an off-duty police officer went to the pool because he had information that made him think that a fight might

---

[1] We have appellate jurisdiction in this case because Jones also contends on appeal that the Street Gang Act is unconstitutional, both on its face and as applied. Jones's constitutional claim was raised in, and distinctly ruled upon, by the trial court, thus invoking this Court's constitutional question jurisdiction. See Ga. Const. 1983, Art. VI, Sec. VI, Par. II (1); *Jenkins v. State,* 284 Ga. 642, 643 (1) (670 SE2d 425) (2008).

soon break out. Shortly after the officer arrived, he saw two cars pull into the south side of the pool parking lot. The first car, a silver Chrysler 300, was driven by Brandon Taylor and was occupied by Jones, Luke, and Jarnay Evans as passengers. The second car, a Chevrolet Impala, was occupied by a heavy-set man known as "Reggie." A witness who saw both of these cars as they approached the pool told another police officer that he heard Taylor ask about the "girl fight" and that he saw men who had exited from the cars loading weapons. Evans subsequently admitted to police officers that he and the other occupants of the 300 and the Impala went to the pool for the purpose of fighting with any men who might have been involved in the earlier altercation in which Luke's infant son was struck.

Around the same time as the 300 and the Impala arrived at the pool, the off-duty officer also saw a third car, which was driven by Jerry Harris, park across the street from the pool. The officer noticed that Harris had a "bulge" in his pants, and he watched as Harris walked to the north side of the parking lot. The officer then saw Harris pull a 9mm handgun out of his pants and start shooting in a southerly direction, toward Jones and the other occupants of the first two cars. One of those shots struck Donald Winchester, an innocent bystander, in the hip. Although the officer did not see Jones firing a weapon, he heard an exchange of gunfire between Harris and others,[2] including at least one shot fired with a shotgun. Evans later told police officers that he saw Jones fire one shot with a .22-caliber pistol and that "Reggie" fired a shotgun.[3] Police found a .22-caliber shell casing on the south side of the parking lot, and they later found a .22-caliber pistol, which Jones admitted was his, in the trunk of a car that was owned by Luke's grandmother and that was parked in front of the house that Jones and Luke shared. An expert witness testified that the .22-caliber shell casing "was probably" discharged from Jones's pistol.

(a) We first consider whether the evidence is sufficient to sustain the aggravated assault conviction, applying the familiar standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), in which we view the evidence in the light most favorable to the verdict and ask whether any rational trier of fact might have found beyond a reasonable doubt from that evidence that the defendant is guilty of the crimes of which he was convicted, leaving

---

[2] The off-duty officer did not see anyone other than Harris actually fire any shots at the pool.

[3] When Evans testified at trial, he said that he did not see Jones at all at the pool, much less that he saw him fire a weapon. His earlier statement to police then was admitted as a prior inconsistent statement. See *Hoffler v. State*, 292 Ga. 537 (3) (739 SE2d 362) (2013).

questions of credibility and the resolution of conflicts in the evidence to the jury. So viewed, the evidence in this case shows that Jones went to the pool with his firearm and several accomplices to settle a dispute, that he and his accomplices loaded weapons as they approached the pool, that they arrived at the pool at roughly the same time as Harris, that a gunfight ensued between Harris, on the one hand, and Jones and his accomplices, on the other, and that Jones participated in the gunfight by firing his weapon. Although it is undisputed that Winchester was shot by Harris, OCGA § 16-2-20 (a) provides that "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." Jones is correct, of course, that mere presence or approval of a criminal act is not sufficient to render one a party to the crime, and a conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the principal perpetrator of the crime. But criminal intent is a question for the jury, and it may be inferred from that person's conduct before, during, and after the commission of the crime. *Perkinson v. State*, 273 Ga. 814, 816 (546 SE2d 501) (2001); see also *Brown v. State*, 291 Ga. 887, 888 (1) (734 SE2d 41) (2012); *Pruitt v. State*, 282 Ga. 30, 32 (1) (644 SE2d 837) (2007); *Eckman v. State*, 274 Ga. 63, 65 (1) (548 SE2d 310) (2001); *Jordan v. State*, 272 Ga. 395, 396 (1) (530 SE2d 192) (2000). From the circumstances proven in this case, a rational jury could have inferred that Jones shared a common criminal intent with Harris to engage in a gunfight in the presence of the innocent bystanders at the pool. See *Emmanuel v. State*, 300 Ga. App. 378, 380 (1) (685 SE2d 361) (2009).[4] And even though Winchester evidently was not an intended victim of the gunfight, the evidence was sufficient for a rational trier of fact to find that Jones was a party to the crime of aggravated assault under the doctrine of transferred intent. See id. See also *Hendricks v. State*, 290 Ga. 238, 240 (1) (719 SE2d 466) (2011); *Smith v. State*, 279 Ga. 423 (614 SE2d 65) (2005) ("[W]hen an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it.") (citation and

---

[4] Although Jones's actions might also have been consistent with a claim of self-defense, Jones argued at trial not that he was defending himself when he fired at Harris, but that he did not have a weapon when he went to the pool. And even if Jones had claimed that he fired his weapon in self-defense, it would have been for the jury to determine whether Jones shot his weapon only to defend himself against Harris or if he instead engaged voluntarily in an unlawful gunfight. See, e.g., *Glenn v. State*, 279 Ga. 277, 277-278 (612 SE2d 478) (2005) ("[c]riminal intent is a question for the jury . . . .").

punctuation omitted); *Perry v. State*, 276 Ga. 836, 837 (1) (585 SE2d 614) (2003) (evidence sufficient to sustain appellants' convictions for aggravated assault (and other charges) either directly or as a party to the crime where one of the appellants fired a weapon during a dispute with a rival group and two innocent bystanders were shot). Accordingly, the evidence adduced at trial is legally sufficient to sustain the aggravated assault conviction.

(b) We next consider whether the evidence is sufficient to sustain the conviction for a violation of the Street Gang Act. Jones was charged in the indictment with violating the Street Gang Act by participating in criminal street gang activity through the commission of an aggravated assault "while associated with a criminal street gang, to wit: the Southside Bloods," and to prove that he violated the Street Gang Act in this way, the State was required to show that Jones was, in fact, associated with the Southside Bloods, that the Southside Bloods was a "criminal street gang," that Jones committed a predicate act of "criminal street gang activity," namely the aggravated assault upon Winchester, and that the commission of the predicate act was intended to further the interests of the Southside Bloods. See *Rodriguez v. State*, 284 Ga. 803, 806-807 (1) (671 SE2d 497) (2009). See also OCGA § 16-15-4 (a) (2009).[5]

Although there was some evidence presented at trial about the existence and activities of the Southside Bloods, the State inexplicably failed to adduce any evidence that Jones was associated with the Southside Bloods or that his commission of an aggravated assault was intended in any way to further the interests of the Southside Bloods. No witness testified that Jones was a member of the Southside Bloods. No witness testified that those accompanying Jones at the time of the shooting were members of the Southside Bloods. No witness testified that Jones was associated in any way with the Southside Bloods. And although officers testified at trial that members of the Southside Bloods often display certain symbols and colors, no evidence was presented that Jones or any of his accomplices displayed those symbols or colors, either on the day of the shooting or at any other time.

In an effort to tie Jones to the Southside Bloods, the State points to evidence presented at trial that police officers found a "grill," bearing a symbol of the "Crips" gang, approximately 50 feet from the location from which Harris fired his weapon. But even if the grill was in some way connected to the shooting, the State did not show how that grill tends to prove that anyone at the pool at the time of the

---

[5] We note that, since 2009, OCGA § 16-15-4 has been amended twice.

shooting, much less Jones, was associated with the Southside Bloods. The State also points to evidence that, prior to the shooting, the off-duty police officer heard someone say, "Y'all take y'all's slob asses back where you came from,"[6] and that "slob" is a derogatory term for a member of the Southside Bloods. But even if the statement about "slob asses" was not hearsay, the State did not identify who made the statement or provide any evidence that the epithet was directed at Jones or his accomplices. Indeed, the evidence presented to the jury does not even show whether Jones had arrived at the scene by the time the statement was made.[7] This evidence is not sufficient, we conclude, to prove either that Jones was associated with the Southside Bloods or that his commission of an aggravated assault related in any way to the activities of the Southside Bloods. Because the evidence, even when viewed in the light most favorable to the State, is insufficient to show that Jones participated in criminal street gang activity while associated with a criminal street gang, his conviction under the Street Gang Act must be reversed. See *Rodriguez*, 284 Ga. at 810 (4) ("To support a conviction, the accused must be shown to have conducted or participated in criminal street gang activity through the commission of an actual criminal act.") (citation and punctuation omitted).

2. We turn now to the contention that the trial court erred when it failed to respond as required by OCGA § 17-8-75 when the prosecuting attorney spoke in his closing argument of matters outside the record. During closing arguments, the prosecuting attorney attempted to link Jones to an earlier gang-related shooting in a public place, saying that "there was a previous incident of gang violence between the Bloods and the Crips at the Henderson Gym. And then come to find out who was there when all of that happened at [the] Henderson Gym that day? Tchywaskie Jones." Jones's lawyer immediately objected and moved for a mistrial, correctly arguing that there was no evidence admitted at trial that Jones was present during the prior incident at the Henderson Gym. Indeed, a police officer had testified

---

[6] In addition, the State points to hearsay evidence that someone referred to either Jefferson or the women accompanying her to the pool as "Southside ho's." But no evidence was presented suggesting that the reference to "Southside ho's" was a reference to the Southside Bloods, as opposed to a reference to the fact that the women were from the part of Albany referred to as "the Southside." Nor is there any evidence that would permit a gang affiliation on the part of Jefferson (or one of the other women accompanying her) to be imputed to Jones based on his status as the friend of the biological father of Jefferson's child. At oral argument, the State acknowledged that there was no evidence that Jefferson or the other women were members of a gang.

[7] In contrast, evidence was presented at the hearing on Jones's motion to suppress that the statement was made after Jones and his accomplices arrived at the pool.

about a shooting at the Henderson Gym involving "Blood" gang members, but the officer did not testify that Jones, or anyone associated with Jones, was present or otherwise involved in the shooting. And later, when the prosecuting attorney asked several character witnesses for Jones if they were "aware" that Jones was involved in the shooting at the Henderson Gym, those witnesses responded that they were not. The State points to no evidence contained in the trial transcripts that supports the claim made by the prosecuting attorney during his closing argument that Jones was connected to the shooting at the Henderson Gym.[8] And our independent review of the transcripts reveals that no such evidence was adduced at trial. Indeed, the prosecuting attorney conceded in a sidebar conference at trial that no such evidence had been presented.

Because the prosecuting attorney made a statement in his closing argument about a "prejudicial matter[ ] which [is] not in evidence, it [was] the duty of the court to interpose and prevent the same." OCGA § 17-8-75. And when Jones timely objected, "the court . . . also [was required to] rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds," or if the trial court thought it necessary, to order a mistrial. Id. But here, after Jones objected to the argument and moved for a mistrial, the trial court denied the motion, and the prosecuting attorney said that he would retract his statement. The prosecuting attorney, however, did not retract his statement, but he instead reiterated to the jury that there had been gang violence at the Henderson Gym, said that Jones's friends had, "of course," denied knowing anything about Jones's involvement in the incident at the Henderson Gym, and concluded, "but we did hear from [the police officer who testified about the shooting]." At that point, Jones again objected and asked for an admonishment and a curative instruction. But instead of directing the jurors to disregard the unsupported statement by the prosecuting attorney and admonishing him, the trial court gave only the standard jury charge that opening statements and closing arguments are not evidence. Jones's lawyer responded that this standard instruction was insufficient and specifically requested an instruction that the jury disregard the

---

[8] We note that, in response to Jones's enumeration of error asserting that the trial court erred when it failed to comply with OCGA § 17-8-75 after the prosecutor's improper argument, the State merely argues that the prosecutor had a good faith belief that Jones was present during the shooting at the Henderson Gym when he asked the witnesses if they were aware of his presence. Nowhere in either its original brief or two supplemental briefs does the State argue that the closing argument was not improper or that the trial court responded as it was required under OCGA § 17-8-75, even though Jones twice pointed out this omission in his appellate briefs.

statement of the prosecuting attorney that Jones was involved in the shooting at the Henderson Gym. The trial court refused to give any additional instruction.

We conclude that the general instruction given by the trial court was an inadequate curative measure and did not serve "to remove the improper impression from [the jurors'] minds," as required by OCGA § 17-8-75.

> [T]he type of instruction that is necessary [after the prosecuting attorney makes a statement about a prejudicial matter not in evidence] will vary depending upon the prejudicial impact of the prosecutor's statement, with specific instructions being necessary in particularly prejudicial cases, and general instructions sufficing in most cases.

*Alexander v. State*, 270 Ga. 346, 350 (2) (509 SE2d 56) (1998) (footnote omitted). Here, the evidence against Jones was not overwhelming,[9] and it was highly prejudicial for the prosecuting attorney to argue that Jones had been involved in a prior gang shooting. For these reasons, we cannot conclude that the generalized standard instruction given by the trial court was sufficient to cure the prejudice worked by the improper argument of the prosecuting attorney or that the failure of the trial court to do something more was harmless. Id.; *Hartry v. State*, 270 Ga. 596, 599 (2) (512 SE2d 251) (1999); cf. *Arrington v. State*, 286 Ga. 335, 346 (15) (a) (687 SE2d 438) (2009) (trial court's failure to respond as required by OCGA § 17-8-75 was harmless based upon the strength of the evidence against the defendant and the trial court's instruction that opening statements and closing arguments are not evidence); *Walker v. State*, 281 Ga. 521, 524 (5) (640 SE2d 274) (2007) (trial court's failure to respond as required by OCGA § 17-8-75 was harmless based upon the innocuousness of the improper comment and the trial court's instruction that the argument of counsel was not evidence). Accordingly, the aggravated assault conviction also must be reversed.

3. Jones asserts numerous other claims of error, including that the Street Gang Act is unconstitutional, both on its face and as

---

[9] For example, there was no evidence that Jones was associated with a gang, and no evidence that the shooting at the pool was gang-related. The only evidence that Jones fired a weapon was the prior statement of Evans, which Evans contradicted in his trial testimony. And even though Jones acknowledged that the .22-caliber pistol that "probably" fired a shot at the pool was his, the weapon was found in Luke's grandmother's car outside a house that Jones shared with Luke, so the evidence was not overwhelming that Jones (and not Luke or one of the other accomplices) fired the weapon at all.

applied to his case. Most of these alleged errors, however, are moot in light of our reversal of the judgment below, and they seem unlikely to recur on any retrial of Jones for aggravated assault. We, therefore, decline to address the remaining claims of error, see *Boring v. State*, 289 Ga. 429, 435 (3) (711 SE2d 634) (2011), with one exception. We will address the denial of Jones's motion to suppress, which seems likely to affect any retrial of Jones for aggravated assault, inasmuch as the motion sought to suppress, among other things, the gun that Jones later admitted was his.

Jones contends that the trial court erred when it denied his motion to suppress because, Jones says, every material allegation contained in the affidavit supporting the warrant that authorized the search was false. The disputed search warrant was issued two days after the shooting, and it authorized a search of the home of Luke's mother, where both Jones and Luke resided, as well as any vehicles that might be found there.[10] Inside the trunk of Luke's grandmother's car, which was parked in front of Luke's mother's home, police officers discovered the .22-caliber pistol that Jones later admitted belonged to him. And police subsequently conducted ballistics testing that connected the pistol to a shell casing found at the scene of the shooting.

In determining whether probable cause exists to issue a search warrant, a magistrate must decide whether, after considering the veracity and basis of knowledge of any persons supplying hearsay information, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Glenn v. State*, 288 Ga. 462, 465 (2) (b) (704 SE2d 794) (2010) (citation and punctuation omitted). And when we review a ruling on a motion to suppress following the issuance of a search warrant, "[w]e review the search warrant to determine the existence of probable cause using the totality of the circumstances analysis set forth in *Illinois v. Gates*, 462 U. S. 213 (103 SC 2317, 76 LE2d 527) (1983)." *Bryant v. State*, 288 Ga. 876, 892 (13) (a) (708 SE2d 362) (2011). Where, as here, an affidavit is alleged to contain material misrepresentations or omissions, any "false statements must be deleted, the omitted truthful material must be included, and the affidavit must be reexamined to determine whether probable cause exists to issue a warrant." *State v. Palmer*, 285 Ga. 75, 78 (673 SE2d 237) (2009); see also *Herrera v. State*, 288 Ga. 231, 233 (2) (702 SE2d 854) (2010).

---

[10] The search at issue was conducted at 510 Willard Avenue in Albany. A separate search was conducted at 503 Willard Avenue, which was the home of Luke's grandmother, but no evidence was seized during that search.

In this case, the magistrate's finding of probable cause to support the issuance of the search warrant was based solely upon the sworn affidavit of a police officer.[11] The affidavit recites that:

> [i]t has been discovered by several witnesses that members of the "Southside Blood" street gang did a drive by shooting in which [the victim] was shot. Tehwaskie [sic] Jones was observed by witnesses having an argument with [the victim] just before the shooting. A confidential informant and Charlie Boone advised that Tehwaskie [sic] Jones lives at 510 Willard Ave. Charlie Boone also witnessed Tehwaskie [sic] Jones getting out of the suspect vehicle used in the shooting on Willard Ave. and running with other subjects that had weapons in their hands a few minutes after the shooting.

The State has acknowledged that the statement in the affidavit about Jones having an argument with the victim was false, as was the statement about the incident being a "drive by shooting."

While the State concedes that several parts of the supporting affidavit are false, it maintains that the statement about a person named Charlie Boone seeing Jones "getting out of the suspect vehicle used in the shooting on Willard Ave. and running with other subjects that had weapons in their hands a few minutes after the shooting" was, for the most part, true.[12] Boone did not testify at the hearing on the motion to suppress, and Jones did not examine the officers who did testify about what Boone might have told them. Accordingly, it was not shown at the hearing that the material information set forth in the affidavit and attributed to Boone was false.[13] In addition,

---

[11] The police officer who signed the affidavit also provided oral testimony to the magistrate, but his testimony was limited to the information contained in the supporting affidavit. The officer said that he had no independent knowledge of the shooting, and he prepared the affidavit based on information provided to him by the lead investigating officer.

[12] The statement in the affidavit that Boone saw the "other subjects" with "weapons" is an overstatement, because the evidence was that Boone saw the men with only one weapon – the shotgun. But the investigating officer's report on his interview with Boone, which was admitted as an exhibit at the hearing on the motion to suppress, supports the rest of the statement that was contained in the affidavit about what Boone saw. According to the investigating officer's report, Boone told the officer that, at the time of the shooting, he was playing football in front of his house on Willard Avenue, where Jones and Luke also lived. While Boone and his friends were in the street, a car "fl[ew] past" them, he saw three men jump out of the car and run toward the woods, and the three men included a man named "Watt-Weezy" or "Watt" and a heavy-set man with a shotgun named "Reggie." Although the officer's report does not identify "Watt-Weezy" or "Watt" except with a physical description, other evidence in the record shows that Jones was known to police as "Wat" or "Watt-Watt."

[13] Although the burden of proving the lawfulness of a warrant is upon the State, and that burden never shifts to the defendant, when a motion to suppress is made on one of the three

although the State concedes that the statement about Jones having been observed *arguing* with the victim just before the shooting was false, that Jones was seen *in the vicinity* of the victim just before the shooting — both were seen at the pool — was not shown to be false. Likewise, even if the affiant had no basis for attributing the shooting to "members of the 'Southside Blood' street gang," it was not disproven that the police had information from several witnesses that a group was involved in the shooting. This information would have provided the magistrate a sufficient basis to find probable cause to issue the search warrant. See *Davis v. State*, 266 Ga. 212, 213 (465 SE2d 438) (1996) ("Under the totality of the circumstances, the issuing magistrate was authorized to make the determination that probable cause existed and that the warrant to search appellants' home should be issued.") (citation omitted); see also *Palmer*, 285 Ga. at 77-78 ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.") (citation omitted); *Burgeson v. State*, 267 Ga. 102, 105 (3) (a) (475 SE2d 580) (1996) ("Flight can be a significant factor in determining probable cause.") (citations omitted); *Vega v. State*, 285 Ga. App. 405, 406 (1) (646 SE2d 501) (2007) ("Flight from the scene of a crime may constitute sufficient probable cause for an arrest under certain circumstances.") (footnote omitted). Because the affidavit demonstrates the existence of probable cause, this enumeration of error has no merit.[14]

*Judgment reversed. All the Justices concur.*

DECIDED MARCH 25, 2013.

*James N. Finkelstein*, for appellant.

---

statutory grounds enumerated in OCGA § 17-5-30 (a) (2), including, as here, an allegation that the warrant was issued without probable cause, the State satisfies its initial burden "by production of the warrant and its supporting affidavit, and by showing either by those documents or by other evidence that the warrant is not subject to the statutory challenge alleged." *Davis v. State*, 266 Ga. 212, 212-213 (465 SE2d 438) (1996). The burden of production then shifts to the defendant to produce evidence to support his challenge. Id.; see also *Watts v. State*, 274 Ga. 373, 375 (2) (552 SE2d 823) (2001).

[14] Jones also claims that the trial court erred in denying his motion to suppress the pretrial statement in which he acknowledged ownership of the .22-caliber pistol. Jones argues that the statement was made while he was in custody pursuant to an unlawful arrest, and that his arrest could not be based on the discovery of evidence in Luke's grandmother's car because that evidence was "fruit of the poisonous tree" obtained in an illegal search. But our holding that the search of the car was valid renders this claim of error meritless.

*Gregory W. Edwards, District Attorney, Matthew Breedon, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.