NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0296
Christopher Alexander Miller
v.
The State

On Appeal from the Superior Court of Peach County
No. 25CR053

Decided: June 2, 2026

ELLINGTON, Justice.

Appellant Christopher Miller appeals his convictions for malice murder and other crimes in connection with the shooting death of two-year-old Marcus Ball, Jr.[1] On appeal, Miller

---

[1] The crimes occurred on July 20, 2022. Miller, Wontazious Bivins, and Jabari Thomas were indicted by a Peach County grand jury on March 17, 2025, as parties to the crime for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), two counts of aggravated assault (one for assault against Marcus Ball, Jr., and one for assault against his sister, one-year-old M.B.) (Counts 3 and 4), and two counts of possession of a firearm during the commission of a felony (Counts 5 and 6). Miller was tried separately from his co-defendants. After a jury trial that ended on May 1, 2025, Miller was found guilty on all counts of the indictment. On May 2, 2025, the trial court sentenced Miller to life in prison without the possibility of parole for malice murder, to 20 consecutive years in prison for the aggravated assault of M.B., and to five years in prison on each firearm offense, the first sentence to run consecutively to the life sentence for malice murder and concurrently with the sentence for aggravated assault and the second sentence to run consecutively to both the malice murder and aggravated assault sentences. Miller filed a notice of appeal on May 2, 2025, and his case was docketed in

contends that the trial court erred by failing to grant his motion for a directed verdict based upon a fatal variance, that there was insufficient proof of causation, and that the trial court erred by failing to instruct the jury on involuntary manslaughter. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence at trial showed the following. In the days and weeks leading up to the night of July 20, 2022, animosity had developed between Miller and Dayquan Williams and his brother, Davonte Howard, at least in part because Miller and Williams were dating the same woman. Williams lived in the Lakeview Apartments in Fort Valley, and one day before the shooting, someone told Miller to go to a street "over there by Lakeview" to see a person known as "Chicago," who was a friend of Williams's. Miller did so, and once there, someone shot at him; Miller told the mother of one of his children that he believed that "they was trying to set him up." In addition, about two weeks earlier, Miller and Howard had a fight at the apartment complex, during which a firearm was discharged.

On the night of July 20, 2022, Miller, Jabari Thomas, Wontazious Bivins, and others congregated outside of Building C at the Lakeview Apartments starting about 9:30 p.m. At the same time, Williams was standing outside of Building D of the apartment complex, which is south of Building C, along with Howard, his friend Jaylon Mitchell, and various other individuals. Marcus Ball, the victims' father, arrived home that night around 10:00 p.m. and saw Williams standing with the group of individuals in front of Building D. He described the size

this Court to the term beginning in December 2025 and was submitted for a decision on the briefs.

2

of the group as "abnormal." Williams lived in Building D, next door to the Ball family.

Shortly before 10:00 p.m. on July 20, Lashaquita Washington parked her car in front of Building C at the Lakeview Apartments. She remained in her car, which was facing Building C, and saw Miller, Bivins, and Thomas outside of that building. About 10:15 p.m., she saw Miller and Bivins with AK-47s, and she left the apartment complex before any shooting started.

The apartment had numerous surveillance cameras that recorded the parties' interactions before the shooting, as well as the shooting itself, from various angles. Lieutenant Faulks of the Fort Valley Police Department testified regarding the surveillance video, narrating the events as they occurred and identifying the people involved as they appeared on the video. She had spent her entire life in Fort Valley, had "gr[own] up" and gone to school with Miller, and also personally knew Thomas, adding that her sister was married to his cousin. She identified Thomas on the video, driving a black car with a yellow stripe down the middle. He parked in front of Building C about 9:37 p.m. About five minutes later, Thomas got out of his car, and three men approached and spoke with him. Shortly thereafter, Miller parked his car in front of Building C and walked to where Thomas was standing in front of his car with several other men.

According to Lieutenant Faulks, a surveillance video showed that, about 10:15 p.m., Miller walked across the parking lot to his car and then walked back to Thomas's car, along with another individual who was carrying "what appear[ed] to be an AK … rifle." As Miller and his companion were walking back toward Thomas's car, Thomas retrieved a gun from his car and placed it on the ground, and Miller picked it up. Meanwhile, another individual opened Thomas's trunk and obtained a gun. A

3

few minutes later, Thomas went back to his car and retrieved another gun, putting it into his waistband. At the same time, Miller's vehicle pulled out of its parking spot and began to exit the parking lot near the group. Before it did so, Miller, while holding a gun, walked over to the driver's side of his vehicle before walking around to the passenger's side and then returning to the group. Miller subsequently walked into a breezeway of Building C and then returned to the parking lot, with a "weapon strapped over his shoulder." At 10:33 p.m., the group, including Miller and Thomas, was congregating near a white truck parked in front of Building C, and Miller's car returned to the apartment complex. About 10:41 p.m., Thomas, with the weapon in his waistband, walked into the breezeway toward the back of Building C. At that time, other members of the group were near or behind the white truck, and some, including Miller, were obscured from view.

About 10:42 p.m., shots were fired from the truck in front of Building C toward Building D and from Building D toward the individuals behind the truck. A man wearing the type and color of clothes worn by Williams that night was taking cover in the breezeway of Building D and firing shots toward Building C. While shots were being exchanged in front of Buildings C and D, Thomas and another individual were in the back of Building C exchanging gunfire with an unidentified gunman firing from the direction of Building D. Back in front of Building C, after the shots were fired, Miller ran from behind the white truck toward his car holding a gun and Thomas ran back through the breezeway to his vehicle; both men drove away from the apartment complex.

During the shootout, two bullets penetrated the exterior wall of the apartment in Building D in which the Ball family lived. One bullet struck the concrete slab of the apartment building, and the other penetrated an interior room, exited that room through

4

a wall, and entered the victims' bedroom. At that time, the oldest sister of M.B. and Marcus Ball, Jr., was holding M.B. in one arm and Marcus Ball, Jr., in the other arm. The sister testified that she heard a gunshot and then looked down and saw that her younger siblings had been struck by a bullet. That bullet first struck M.B. in the shoulder and then Marcus Ball, Jr., in the head, causing his death. Numerous shell casings were found behind and to the side of the white truck that Miller and his companions were hiding behind in front of Building C, as well as in and in front of the breezeway of Building D. Rifle casings were found only in front of Building C; some were "AK-47 SKS type round[s]" and some were "M-16 AR-15 type round[s]." The victims' apartment was behind the breezeway of Building D from which shots were fired. After the shooting, Marcus Ball, Sr., ran outside holding his son and saw numerous people running into Williams's apartment. A law enforcement officer spoke with Williams after the shooting and described him as being "visibly upset." Although Williams acknowledged, in response to a question from the prosecutor, that he told that officer that a "b**ch a** N word just shot at me. When I catch him, I'm going to kill him," Williams testified that he was inside his apartment at the time of the shooting. There was also evidence that an argument between Miller and Williams over their interest in the same woman led to the shooting.

2. Miller contends that the evidence was constitutionally insufficient to support his convictions because, according to Miller, the State failed to provide proof that either he or one of his companions fired the shot that entered the victims' apartment. We disagree.

When this Court evaluates a due process challenge to the sufficiency of the evidence, "we view all of the evidence presented

at trial in the light most favorable to the verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jones v. State*, 304 Ga. 594, 598 (2018). "This Court does not reweigh evidence or resolve conflicts in testimony but rather defers to the jury's assessment of the weight and credibility of the evidence." *Davis v. State*, 316 Ga. 418, 420 (2023) (quotation marks omitted). Moreover, a defendant is guilty of a charged offense "upon proof that the crime was committed and that [he] was a party to it." *Powell v. State*, 291 Ga. 743, 744 (2012) (quotation marks omitted), and under OCGA 16-2-20(a),(b)(3), a person is a party to a crime if he, among other things, "[i]ntentionally aids or abets in the commission of the crime." "Conviction as a party to the crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Badie v. State*, ___ Ga. ___ (2026), S26A0051, slip op. at 4 (Ga. Mar. 17, 2026).

Under that standard, the evidence summarized above was sufficient to show, contrary to Miller's contention, that either Miller or one of companions fired the shot that killed Marcus and injured his sister. Here, Washington saw Miller and Bivins with rifles shortly before the shooting, and surveillance video showed that Miller and his companions, who had numerous firearms, were gathering and communicating with each other in front of Building C beginning about an hour before the fatal shooting. The video shows that they then sheltered themselves behind and around the white truck in front of Building C and fired numerous shots toward the intended victim, Williams, who was located in

6

the breezeway of Building D.[2] In doing so, Miller and his companions were also firing in the direction of the victims' apartment, which was located behind Williams. Although Williams and his companions were also firing shots, they were firing them toward Building C, in the opposite direction of the victims' apartment. Moreover, immediately after the victims' sister heard the shots, M.B. and Marcus Ball, Jr., were each struck by the same bullet. Finally, immediately after the shooting Miller and his companions fled the crime scene. This evidence was constitutionally sufficient for the jury to conclude that Miller or one of his companions fired the shot that struck the victims. In sum, even if Miller himself did not fire the fatal shot, the evidence presented at trial was sufficient to sustain his convictions at least as a party to the crimes. See *Badie* ., ___ Ga. at ___ , slip op. at 3-5 (explaining that "we have repeatedly held that participating in a gunfight in a crowded area is enough to support a conviction for malice murder as a party to the crime" and holding that evidence that the defendant and his companions opened fire on a group of people, killing one and injuring four, was sufficient to support the defendant's conviction for malice murder crimes as party to the crime); *Williams v. State*, 313 Ga. 325, 328 (2022) (holding that evidence that the defendant assisted in planning a shooting, participated in it by driving a vehicle, communicated with other

---

[2] Although Williams testified that he was inside his apartment at the time of the shooting, there was sufficient evidence for the jury to conclude that he was outside, participating in the shootout, including evidence that his dispute with Miller was the reason for the shootout, that Marcus Ball, Sr., saw Miller outside his apartment in the breezeway of Building D shortly before the shooting, that people ran into Williams's apartment immediately after the shooting, that video footage showed that a person firing shots from the breezeway of Building D was wearing the type and color of clothes that Williams wore that night, and that Miller acknowledged that someone had shot at him.

participants, and fled after the crimes authorized conviction as a party to the crime of malice murder); *Jones v. State*, 292 Ga. 656, 658 (2013) (holding that the evidence was sufficient to sustain the defendant's convictions as a party to the crime where he did not fire the shot that struck the victim but where he and his companions went to a crowded pool and engaged in a shootout in which a bystander was shot); *Powell v. State*, 291 Ga. 743, 745 (2012) (holding that, even if the defendant's companion, and not the defendant, "fired the fatal shot" that killed the victim, the evidence was sufficient to support the defendant's conviction for murder as a party to the crime, as the evidence showed that the defendant and his companion were engaged in a common enterprise at the time of the shooting).

This conclusion is not overcome by any of Miller's specific arguments. For instance, he argues, correctly, that no forensic evidence tied any shell casings found at the scene to any gun owned by him or his companions. Miller also notes that the investigator who testified about finding the bullet holes in the victims' apartment said that he could not say when the bullet holes were created and that he never saw the children and their injuries and could not say whether the bullet that entered the bedroom wall was the one that struck the children. However, "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Jones v. State,* 319 Ga. 758, 761–62 (2024) (quotation marks omitted). Moreover, "[i]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Green v. State,* 304 Ga. 385, 387-88 (2018) (quotation marks omitted).

3. Miller claims that there was a fatal variance between the indictment and the trial evidence and that the trial court erred in ruling otherwise. Specifically, Miller contends that there was a fatal variance because the indictment charged him with intentionally shooting M.B. and Marcus Ball, Jr., while the evidence at trial showed that Williams, and not the children, was the intended target of the gunfight. Miller claimed at trial and claims on appeal that he therefore had no notice that he would have to defend against evidence that he intended to harm Williams and that that intent would be transferred to Marcus and M.B.

We "no longer employ an overly technical application of the fatal variance rule, focusing instead on materiality. The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused." *Lebis v. State*, 302 Ga. 750, 759 (2017) (quotation marks omitted). Generally, a variance is not fatal "if the allegations inform the accused as to the charges against him so as to enable him to present his defense and not be taken by surprise by the evidence at trial, and are adequate to protect the accused against another prosecution for the same conduct." *Scott v. State*, 309 Ga. 764, 767 (2020).

To begin, the malice murder and aggravated assault counts of the indictment tracked the language of the relevant statutes and sufficiently apprised Miller of the nature and substance of the criminal charges against him. See *Brown v. State*, 307 Ga. 24, 28 (2019). Although Miller points to the fact that the evidence at trial showed that the intended victim was Williams and not the children, he fails to offer any reason as to how the indictment's failure to name Williams as the intended victim prevented him from presenting a viable defense to charges against the children

9

or surprised him at trial. Id. (holding that where the indictment charged the defendant with attempted armed robbery by pointing a gun at the victim and demanding his money, there was no fatal variance where the proof at trial did not show a verbal demand for the property, as the indictment tracked the language of the statute and sufficiently informed the defendant of the nature and substance of the criminal charge and as the defendant did not show that she "was unable to present a viable defense" to the charge or was "surprised or misled at trial" (quotation marks omitted)). Accord *Scott v. State*, 309 Ga. 764, 767 (2020) (rejecting the defendant's fatal variance claim in part because the defendant failed to show "how the indictment impaired his ability to present a defense"). In fact, the record shows that Miller raised a defense to the State's theory of the case, arguing in closing that the jury should reject the State's theory that Williams was the intended victim, as well as the State's reliance on the doctrine of transferred intent, because Williams testified that he was inside his apartment at the time of the shooting. See *Eubanks v. State*, 317 Ga. 563, 582–83 (2023) (rejecting a defendant's claim that the indictment failed to enable him to present an intelligent defense on the ground that the record showed that the defendant did present defenses against the alleged crimes).

Moreover, the doctrine of transferred intent is firmly rooted in Georgia law. See *Smith v. State*, 315 Ga. 357, 362 (2022) (explaining that "[u]nder the doctrine of transferred intent, when an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it"); *Happoldt v. State*, 267 Ga. 126, 127 (1996) (same); *Chelsey v. State*, 121 Ga. 340, 343 (1904) (same). Therefore, Miller should not have been surprised at trial

that the State named in the indictment the individuals who actually suffered from Miller's original intent and relied on the doctrine of transferred intent at trial. See *Bradshaw v. Richey*, 546 U.S. 74, 76–77 (2005) (holding that the defendant could not claim unfair surprise that the doctrine of transferred intent, "firmly rooted in Ohio law," was applied to his case (quotation marks omitted)).

Finally, because the indictment against Miller recounted in detail the incident for which Miller was charged and convicted, it was adequate to protect Miller from being prosecuted again for the same offense. See *Brown*, 307 Ga. 28. Accord *State v. Grube*, 293 Ga. 257, 262 (2013) (holding that an indictment was sufficient to protect the defendant against another prosecution for the same conduct where it, among other things, specified the conduct being charged and named the date on which the conduct took place).

For these reasons, Miller's fatal variance claim fails.

4. Miller contends that the trial court erred by failing to charge the jury on the lesser included charge of involuntary manslaughter based on the underlying unlawful act of reckless conduct. Miller contends that this charge was warranted by evidence that he, either alone or as a party to the crime, committed the misdemeanor of reckless conduct when he or one of his companions fired a weapon in the direction of the victims' apartment. We disagree.

"A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." OCGA § 16-5-3(a). To warrant this charge, "the unlawful act underlying the unintentional death of the victim must be an act other than a felony." *Sims v. State*, 321 Ga. 627, 636 (2025)

11

(quotation marks omitted). Here, the act of Miller and his companions of firing weapons at Williams and other individuals amounted to the felony of aggravated assault. See OCGA § 16-5-21 (a)(2), (b). The trial court therefore properly denied Miller's request to charge on involuntary manslaughter. See *Sims*, 321 Ga. at 636-637 (holding that the defendant was not entitled to an instruction on unlawful act involuntary manslaughter because his act of discharging a firearm constituted the felony of aggravated assault); *Chambliss v. State*, 318 Ga. 161, 167 (2023) (holding that the trial court did not err in failing to instruct the jury on unlawful act involuntary manslaughter based on the theory that the defendant committed the misdemeanor of reckless conduct by striking the victim in the head with a loaded gun, as that act amounted, instead, to the felony of aggravated assault).

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*