# WHOLE COURT

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0474. HAMLETT v. THE STATE.

A13A0882. HAMLETT v. THE STATE.

ELLINGTON, Presiding Judge.

Following a joint trial, a Fulton County jury found Salim Hamlett and his brother, Jalim Hamlett, guilty of burglary, OCGA § 16-7-1 (b), and possession of tools for the commission of a crime, OCGA § 16-7-20 (a). The jury also found Jalim Hamlett guilty of two misdemeanor traffic offenses: improper tag display, OCGA § 40-2-41, and failure to have operational brake lights, OCGA § 40-8-25 (a), (b). The trial court denied their motions for new trial, and the Hamletts have appealed. Because both cases arise from the same facts and involve a joint trial and motion hearings, we have consolidated them.

The appellants contend that the trial court erred in denying their joint motion to suppress evidence for two reasons. First, Jalim Hamlett argues that the State improperly seized the evidence following the illegal placement of a Global Positioning System ("GPS") tracking device on his truck and the traffic stop that resulted therefrom.[1] Second, both appellants argue that the court should have suppressed the evidence on the basis that their three to four hour custodial detentions following the traffic stop were illegal.

The appellants also contend that the court erred in denying their motions for new trial due to their counsel's conflict of interest that arose from his joint representation of them at trial, that their trial counsel provided ineffective assistance, and that there was insufficient evidence to support their convictions. For the reasons explained below, we reverse the burglary and possession of tools convictions of both

---

[1] To the extent that there was an issue in the court below as to whether Salim Hamlett, as a passenger, had independent standing to object to the legality of the traffic stop, we note that the Supreme Court of the United States has held that, when a police officer conducts a traffic stop, the passengers, as well as the driver, are seized within the meaning of the Fourth Amendment and, thus, have standing to challenge the constitutionality of the stop. *Brendlin v. California*, 551 U. S. 249, 251, 263 (II) (C) (127 SCt 2400, 168 LE2d 132) (2007) (noting that, to hold otherwise would allow evidence uncovered as a result of an arbitrary traffic stop to be admissible against any passengers, thus providing the police with a "powerful incentive to run the kind of 'roving patrols' that would still violate the driver's Fourth Amendment rights.") (citations omitted).

Salim and Jalim Hamlett, but affirm Jalim Hamlett's convictions on the misdemeanor traffic offenses.

1. According to Jalim,[2] the trial court erred in denying the motion to suppress because there was not sufficient probable cause to support the court order that authorized the State to surreptitiously install the GPS tracking device on his pickup truck and to continuously monitor the signals from the device for over two weeks. He also argues that the subsequent traffic stop of his truck resulted solely from the State's illegal installation and monitoring of the device and that, but for the signals elicited from the illegal tracking device, the traffic stop was not supported by a reasonable articulable suspicion that he was or had been involved in criminal activity. He contends, therefore, that the traffic stop was illegal and that all evidence seized as a result of the stop should have been suppressed by the trial court. We agree.

"When a defendant moves to suppress evidence based on an illegal search, the State bears the burden of proving that the search was lawful." (Citation and punctuation omitted.) *Lott v. State*, 303 Ga. App. 775, 780 (2) (694 SE2d 698) (2010).

_____

[2] For clarity, we will hereinafter refer to each appellant solely by his first name in order to distinguish him from his brother.

Because the trial court sits as the trier of fact when ruling on a motion to suppress or a motion in limine, its findings based upon conflicting evidence are analogous to a jury verdict and should not be disturbed by a reviewing court if there is any evidence to support them. When we review a trial court's decision on such motions to exclude evidence, we construe the evidence most favorably to uphold the findings and judgment, and we adopt the trial court's findings on disputed facts and credibility unless they are clearly erroneous. When the evidence is uncontroverted and no question of witness credibility is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review. With mixed questions of fact and law, the appellate court accepts the trial court's findings on disputed facts and witness credibility unless clearly erroneous, but independently applies the legal principles to the facts.

(Citations and punctuation omitted.) *State v. Tousley*, 271 Ga. App. 874 (611 SE2d 139) (2005). Viewed in favor of the trial court's order denying the motion to suppress, the record shows the following relevant events that preceded the traffic stop at issue.

On August 5, 2010, someone committed a burglary at a home on Northside Drive in Fulton County, stealing computers, a television, and jewelry. According to the homeowner, at about 8:00 p.m. the next evening, a man he did not know came to his front door and offered to perform yard work, even though it was raining and

4

almost dark. The homeowner refused the offer but asked for the man's phone number, then watched the man walk away along Northside Drive. Because his home had been burglarized the day before, the homeowner became suspicious, so he got into his car and drove down Northside Drive to follow the man. He saw the man get into the passenger side of a dark colored GMC pickup truck, and he followed the truck long enough to get its tag number, which was "BMP0476." The homeowner then reported the encounter to the police.

An Atlanta police detective, who was also a member of the Fulton County Burglary Task Force, testified that, in August 2010, he was investigating burglaries that had occurred in the Northside Drive area. Upon receiving the homeowner's report of the August 6 incident, the detective determined that the tag of the pickup truck was registered to Jalim, and he obtained a Cobb County address for Jalim. The detective knew that there was an outstanding arrest warrant for Jalim on a charge of theft by receiving stolen property. According to the detective, that charge arose from a January 2010 theft of three dishwashers from an Atlanta business; the dishwashers were later found at a building supply surplus store. The store's records showed that Jalim and another man, Zaid Ashanti, had brought the dishwashers to the store to sell a few days after they were stolen.

Based on this information, the detective suspected that Jalim might have been involved in the August 5 residential burglary on Northside Drive, and he applied for a court order from the Superior Court of Cobb County[3] authorizing him to secretly install a GPS tracking device on Jalim's pickup truck so he could monitor Jalim's movements throughout the area. He completed an affidavit recounting the above information and stating as follows:

> This Affiant believes that Jalim Basheer Hamlet [sic] and other unknown accomplices are involved in the crime of Burglary in the Atlanta Metro Area. This Affiant requests authorization from the court to install and monitor a GPS signaling device on the 1998 GMC Sierra pick up truck Georgia tag #BMP 0476 to assist in surveillance of the vehicle and its occupants in efforts to identify accomplices and possible fencing locations of stolen goods and lead Police to the arrest of Jalim Basheer Hamlet [sic].

Based solely upon this affidavit, the Cobb County court issued an order in which it found that there was probable cause to believe that Jalim and others "have committed the crimes of Burglary, Theft by taking and Theft by Receiving," that Jalim's "vehicle

---

[3] The detective applied for the order in Cobb County because he knew Jalim resided in Smyrna, which is in Cobb County. Although, in the court below, the appellants initially challenged the Atlanta detective's authority to seek an order in Cobb County, they expressly abandoned that issue during the motion to suppress hearing.

6

will be used by [him and others] as his means of transportation, including as means of transportation in connection with the illegal activity," and that information obtained by the use of the GPS tracking device "will be relevant and material to the ongoing investigation being conducted by the City of Atlanta Police Department and the Fulton County Multi-jurisdictional Burglary Task Force." Based upon these conclusions, the court authorized the surreptitious entry into Jalim's truck "at any hour of the day or night" in order to install the device, using "clandestine means" if necessary, as well as the continuous monitoring of the signals from that device for up to 50 days from the date of the order, whether the truck was in a public place or on private property, including when the truck was concealed from view. The detective then went to Jalim's home and, without Jalim's knowledge or consent, installed the device on the truck's undercarriage while it was parked in Jalim's driveway.

About 15 days later, on August 30, Atlanta and Sandy Springs police officers monitoring the GPS signals from Jalim's truck observed that the truck was traveling toward Sandy Springs. Because the signals later indicated that the truck stopped for approximately 28 minutes at a home on Rebel Trail in Sandy Springs, the officers suspected that Jalim was involved in illegal activity at that address and issued a "be on the lookout" ("BOLO") alert for the truck, giving a description of the truck and its

tag number. Within minutes, a Sandy Springs officer observed a truck matching that description[4] and followed it for a few miles before conducting a traffic stop; he did not stop the truck immediately because he was waiting for backup officers to arrive and assist him when he stopped the truck.

Following the traffic stop, the officers arrested the driver, Jalim, his brother, Salim, and a third person and charged them with a burglary at the Rebel Trail address.[5] Defense counsel for the appellants filed a joint motion to suppress evidence seized as a result of the traffic stop, challenging the legality of the GPS tracking device and the traffic stop, as well as contending that the State illegally detained them for an unreasonable amount of time (three to four hours) following the stop without probable cause to do so. The trial court denied the motion, ruling that the use of the GPS device was legal because the "mere placement of a beeper device into contraband or an otherwise lawful object does not amount to an illegal search or

---

[4] Although the officer also testified that, as he followed the truck, he saw that the truck's tag number matched the one given in the BOLO alert, the undisputed evidence – including his subsequent hearing testimony – shows that, prior to the traffic stop, the truck's tag was completely covered by the paper "drive-out" tag that is the subject of Jalim's improper tag display conviction.

[5] The third man riding in the truck at the time of the stop joined in the appellants' motion to suppress, but was tried separately and is not a party to this appeal.

seizure where there is no trespass involved and there exists probable cause to believe that a crime is intended,"[6] and that "even the *warrantless* . . . monitoring of signals from inside an automobile traveling on public roads does not constitute an unreasonable search or seizure because it does not reveal anything that could not be observed through visual surveillance."[7] (Emphasis in original.) It also found that the traffic stop and the lengthy detention that followed were legal because they were based on the articulable suspicion and probable cause that arose from the officers' monitoring of the GPS device, the BOLO alert that resulted therefrom, the officers' observation of possible proceeds of a suspected burglary laying in plain sight in the truck's bed following the stop, and the traffic offenses (the truck's inoperable brake light and improper tag) observed by the police. Following the denial of their motion to suppress, the appellants were jointly tried and convicted by a jury, and this appeal followed the denial of their motions for new trial.

(a) The first issue presented is whether the State's actions regarding the GPS tracking device, i.e., attaching the GPS device to Jalim's truck and then, for over two

_____

[6] See *Dunivant v. State*, 155 Ga. App. 884, 888 (1) (273 SE2d 621) (1980).

[7] See *United States v. Knotts*, 460 U. S. 276, 281-285 (II) (103 SCt 1081, 75 LE2d 55) (1983); *Devega v. State*, 286 Ga. 448, 453-454 (4) (d) (689 SE2d 293) (2010).

weeks, continuously monitoring the signals in order to track his movements throughout the greater Atlanta metropolitan area without his knowledge or consent, constituted an invasion of his privacy under the Fourth Amendment that had to be authorized by a valid search warrant supported by probable cause. Given the recent decision by the Supreme Court of the United States in *United States v. Jones*, ___ U. S. ___ (132 SCt 945, 181 LE2d 911) (2012), we must answer in the affirmative.[8]

The facts presented in *Jones* are, in relevant part, as follows:

In 2004 respondent Antoine Jones, owner and operator of a nightclub in the District of Columbia, came under suspicion of trafficking in narcotics and was made the target of an investigation by a joint FBI and Metropolitan Police Department task force. Officers employed various investigative techniques, including visual surveillance of the nightclub, installation of a camera focused on the front door of the club, and a pen register and wiretap covering Jones's cellular phone. Based in part on information gathered from these sources, in 2005 the Government applied to the United States District Court for the District of Columbia for a warrant authorizing the use of an electronic tracking device on the Jeep Grand Cherokee registered to Jones's wife. A warrant issued, authorizing installation of the device in the District of Columbia and within 10 days. On the 11th day, and not in the District of Columbia but

___

[8] We note that the Supreme Court decided *Jones* in January 2012, after the trial court in this case denied the appellants' motion to suppress and they were convicted, but before the court denied their motion for new trial.

10

in Maryland, agents installed a GPS tracking device on the
undercarriage of the Jeep while it was parked in a public parking lot.
Over the next 28 days, the Government used the device to track the
vehicle's movements[.]

(Footnote omitted.) Id. at __ (I). After his arrest, Jones filed a motion to suppress

evidence obtained through the use of the GPS device. Id. at __ (I). Although the

government conceded that its agents did not comply with the warrant when it

installed the GPS device, it argued that the evidence at issue was still legally obtained

because the installation and monitoring of the GPS device did not constitute a search

or seizure and, thus, did not require a warrant. Id. at __, n. 1 (I). The district court

denied the motion in part, ruling that, because Jones had no reasonable expectation

of privacy while traveling in his car on public thoroughfares, the data recovered from

the device during that time was admissible. Id. at ___ (I).[9] On appeal, the Court of

Appeals for the District of Columbia Circuit reversed Jones' conviction, ruling that

the warrantless use of the GPS device violated the Fourth Amendment. Id. at __ (I).

The Supreme Court affirmed that ruling, holding that the government's installation

of a GPS tracking device to an individual's vehicle, and the subsequent use of that

---

[9] In so ruling, the district court relied on *United States v. Knotts*, 460 U. S. at
281 (II), the same case relied upon by the trial court in the instant case.

11

device to monitor the vehicle's movements on public streets, constitutes a search within the meaning of the Fourth Amendment. Id. at ___ (II) (A). The Court explained its ruling by stating that "[i]t is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." Id. at ___ (II) (A).[10]

---

[10] In *United States v. Maynard*, 615 F3d 544, 559-563 (2) (D.C. Cir. 2010), the opinion that was affirmed by the Supreme Court's decision in *Jones*, the Circuit Court ruled as follows:

In considering whether something is "exposed" to the public [for the purpose of determining whether a reasonable expectation of privacy exists,] we ask not what another person can physically and may lawfully do but rather what a reasonable person expects another might actually do. . . . [We conclude that] the whole of a person's movements over the course of a month is not *actually* exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil. It is one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work. It is another thing entirely for that stranger to pick up the scent again the next day and the day after that, week in and week out, dogging his prey until he has identified all the places, people, amusements, and chores that make up that person's hitherto private routine. . . . [Further, we conclude that the] whole of one's

12

movements over the course of a month is not *constructively* exposed to the public because, like a rap sheet, that whole reveals far more than the individual movements it comprises. The difference is not one of degree but of kind, for no single journey reveals the habits and patterns that mark the distinction between a day in the life and a way of life, nor the departure from a routine that, like the dog that did not bark in the Sherlock Holmes story, may reveal even more. As with the "mosaic theory" often invoked by the Government in cases involving national security information, "What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene." *CIA v. Sims,* 471 U. S. 159, 178 (105 SCt 1881, 85 LEd2d 173) (1985)[.] Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. These types of information can each reveal more about a person than does any individual trip viewed in isolation. Repeated visits to a church, a gym, a bar, or a bookie tell a story not told by any single visit, as does one's not visiting any of these places over the course of a month. The sequence of a person's movements can reveal still more; a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story. A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups -- and not just one such fact about a person, but all such facts. . . . A reasonable person does not expect

13

Accordingly, we conclude that, pursuant to the Supreme Court's ruling in *Jones*, the State's installation and monitoring of the GPS tracking device in this case constituted a search under the Fourth Amendment that had to be authorized by a valid warrant.

(b) It follows that the next question presented here is whether the affidavit executed by the detective when he applied for a court order authorizing the GPS tracking device presented sufficient facts from which the Cobb County judge could

anyone to monitor and retain a record of every time he drives his car, including his origin, route, destination, and each place he stops and how long he stays there; rather, he expects each of those movements to remain "disconnected and anonymous[.]"

(Citations and punctuation omitted; emphasis supplied.) See also *People v. Weaver,* 909 NE2d 1195, 1199 (N.Y. 2009) (Prolonged GPS monitoring "yields . . . a highly detailed profile, not simply of where we go, but by easy inference, of our associations – political, religious, amicable and amorous, to name only a few – and of the pattern of our professional and avocational pursuits."); *State v. Jackson,* 76 P3d 217, 224 (Wash. 2003) ("In this age, vehicles are used to take people to a vast number of places that can reveal preferences, alignments, associations, personal ails and foibles. The GPS tracking devices record all of these travels, and thus can provide a detailed picture of one's life.").

find the existence of probable cause that was necessary to support the issuance of a search warrant. We conclude that it did not.

> A search warrant must be supported by probable cause, or reasonable grounds, to believe that evidence of a crime will be found in a particular place. In determining whether an affidavit provided sufficient probable cause, the issuing magistrate or judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.[11] And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. Where the State fails to show any connection between the items sought and the place to be searched, however, there are no reasonable grounds for the search.

(Citations and punctuation omitted.) *State v. Brantley*, 264 Ga. App. 152, 153-154 (589 SE2d 716) (2003).

As shown above, the affidavit in this case stated that the detective was a member of a multi-jurisdictional burglary task force that was investigating burglaries

---

[11] OCGA § 17-5-21 (a) provides, in relevant part, that a search warrant affidavit must state "facts sufficient to show probable cause that a crime is being committed or has been committed" and must "particularly describe[ ] the place or person, or both, to be searched and things to be seized[.]"

15

in the "Atlanta metro area"; there was a seven-month-old outstanding warrant for Jalim's arrest for theft by receiving stolen goods, a charge that arose following a January 2010 burglary of an Atlanta business (a crime for which he has not been charged); there had been a burglary on Northside Drive on August 5; and a man approached the same house the next evening offering to do yard work and, when he left, he got into the passenger side of a pickup truck with a tag that was registered to Jalim. However, during the motion to suppress hearing, the detective admitted that, at the time he executed the affidavit, there was no evidence that Jalim had been involved in the actual burglary of the business in January 2010, nor was there any evidence that his truck had been used in that burglary. Similarly, he admitted that there was no evidence that either Jalim or his truck had been at the scene of the August 5 burglary on Northside Drive. It is also undisputed that the man who approached the homeowner on the day after that burglary committed no crime, that the homeowner only described the man as a "black man" during the motion to suppress hearing, and that the homeowner has never identified the man as either of the appellants.

Further, as for the affidavit's assertion that the GPS device could "lead [the] Police to the arrest of Jalim," the affidavit itself shows that there was already a seven-

16

month-old outstanding arrest warrant for Jalim, and it gave his home address. Thus, the State clearly had the necessary information and a sufficient basis for effecting the arrest of Jalim before the detective even executed the affidavit.

Under these circumstances, we conclude that the detective's affidavit failed to provide a sufficient basis from which the Cobb County court could find the probable cause necessary to authorize the State's surreptitious and non-consensual installation and monitoring of the GPS tracking device. See *State v. Brantley*, 264 Ga. App. at 153-155 (After noting that "time is assuredly an element of the concept of probable cause" because, "[i]f the prior circumstances relied on to establish probable cause have grown stale with time, they are unlikely to provide a reliable barometer of present criminal conduct," this Court concluded that a search warrant for the defendant's home was not supported by probable cause when two months had passed since the crime for which he was being investigated had occurred.) (citation and punctuation omitted).

Although the dissent in this case correctly asserts that a magistrate's decision to issue a search warrant based upon its finding of probable cause is entitled to "substantial deference" by reviewing courts, this Court is not obligated to defer to a decision that is based upon a finding that is clearly erroneous, as in this case. In its

17

order, the magistrate concluded that there was probable cause to believe that Jalim and others "have committed the crimes of Burglary, Theft by taking and Theft by Receiving" and that Jalim's "vehicle will be used by [him and others] as his means of transportation . . . in connection with the illegal activity[.]" As shown above, however, during the motion to suppress hearing, the detective who was investigating Atlanta-area burglaries and who completed the search warrant affidavit conceded that there was *no evidence* that Jalim or his truck were involved in either the January 2010 burglary of a business[12] or the August 2010 Northside Drive residential burglary. Further, we find the dissent's suggestion that the detective demonstrated some connection or nexus between the January 2010 business burglary and the August 2010 residential burglary by showing that both offenses involved the theft of "appliances" to be specious, given that the former burglary involved the theft of three dishwashers from a business and the latter involved the theft of computers, a television, and jewelry from a private residence.

---

[12] Although the dissent contends that Jalim had sold three dishwashers that had been stolen in the January 2010 burglary to a surplus building supply business "and that Fulton County therefore had issued arrest warrants for [him]," it is important to note that the arrest warrants charged Jalim with *theft by receiving*, not burglary or theft by taking.

It is axiomatic that "[m]ere suspicion does not amount to probable cause." *Shivers v. State*, 258 Ga. App. 253, 256 (573 SE2d 494) (2002). See also *Zimmerman v. State*, 131 Ga. App. 793, 795 (207 SE2d 220) (1974) ("Rumor, suspicion, speculation or conjecture is not sufficient to show probable cause. The police may not search and seize and then look for probable cause to justify their action. Probable cause must exist at the time of the search and seizure.") (citation omitted). The dissent, however, relies upon *Marlow v. State*, 288 Ga. 769, 770 (2) (707 SE2d 95) (2011), for the proposition that "[a]n officer's inference that items sought will be at the place to be searched requires no more than 'a fair presumption' to be reasonable." (Citations and punctuation omitted.) Pretermitting whether this proposition applies in a situation officers are conducting a "search" through the use GPS tracking technology in order to collect evidence of crimes which have not yet been committed, the facts presented in *Marlow* are clearly distinguishable from those presented in the instant case. In *Marlow*, police officers received an anonymous tip that they would find Marlow, who had two prior arrest warrants pending against him, inside a house. Id. at 769 (1). Officers went to the house, knocked on the front door, and observed a man look out an upstairs window and then disappear. Id. Although the officers could not positively identify the man, his appearance was consistent with a

19

photograph of Marlow. Id. Despite the officers' repeated knocking, no one answered the door. Id. While outside, police observed a car that had been backed into the driveway so that its tag was not visible from the street; the car was locked and its alarm was activated. Id. at 769-770 (1). After running the tag, police discovered that the car had been stolen. Id. at 770 (1). From this evidence, the police reasonably inferred that someone had taken the car keys into the house. Id. at 770 (2). This inference, combined with evidence that a man who resembled Marlow was inside the house and was refusing to answer the door, was sufficient to provide probable cause for the issuance of a warrant to search the house for the stolen car keys. Id. at 770-771 (2).

While we agree that these facts arguably support a "fair presumption" that the stolen car keys would be found inside the house, we fail to see any analogous or comparable facts in the instant case upon which to base such a presumption.

Finally, although the dissent asserts that "the burden of producing evidence to challenge the validity of the warrant shifted to [Jalim] once the State produced the warrant and the supporting affidavit establishing probable cause," we disagree.

> Although the burden of proving the lawfulness of a warrant is upon the
> State, and that burden never shifts to the defendant, when a motion to

20

suppress is made on one of the three statutory grounds enumerated in OCGA § 17-5-30 (a) (2), including, as here, an allegation that the warrant was issued without probable cause, the State satisfies its initial burden by production of the warrant and its supporting affidavit, *and by showing either by those documents or by other evidence that the warrant is not subject to the statutory challenge alleged*. The burden of production *then* shifts to the defendant to produce evidence to support his challenge.

(Citations and punctuation omitted; emphasis supplied.) *Jones v. State*, 292 Ga. 656, 664 (3), n. 13 (740 SE2d 590) (2013). In other words, simply producing the warrant and the supporting affidavit does *not* meet the State's threshold burden; it must *also* show *through those documents or other evidence* that the warrant is not subject to the challenge raised by the defendant. Id. Thus, when the defendant asserts that the warrant was invalid because it was not supported by probable cause, as in this case, the State must show that probable cause existed *before* the burden shifts to the defendant. Id.[13] Unlike the dissent, we conclude that the State failed to meet this

---

[13] See *Graddy v. State*, 277 Ga. 765, 767-768 (3) (596 SE2d 109) (2004) (The Supreme Court of Georgia expressly rejected any notion that, under Georgia law, the challenger of a search warrant has the burden of proving its invalidity. The Court ruled as follows: "Once a motion to suppress has been filed, the burden of proving the lawfulness of the warrant is on the State and that burden never shifts. The only burden upon the challenger of a search warrant is that of producing evidence to support his challenge, *which burden is shifted to him only after the State has met its initial*

21

initial burden and, as a result, find that the burden never shifted to Jalim to establish the absence of probable cause.

It follows that the trial court erred in denying the appellants' motion to suppress all evidence that was seized as a result of the illegal use of the GPS device. See *State v. King*, 287 Ga. App. 680, 681-683 (652 SE2d 574) (2007) (While two brothers were visiting a friend's home, officers entered without consent or a warrant and conducted an illegal pat-down search of one of the brothers, during which they found a small package of methamphetamine in his pocket. Based upon this discovery, officers secured a search warrant and searched the residence, and the evidence they found led to the indictment of both brothers for drug-related offenses. The trial court granted the brothers' motion to suppress the evidence, and this Court affirmed, concluding that the evidence was obtained as a direct result of the exploitation of the initial illegality, the pat-down search, and, thus, was properly excluded.).[14]

_____

*burden of producing evidence showing the validity of the warrant*." The Court expressly overruled any case that placed the burden of proof on the defendant who challenges the validity of a search warrant.) (citations and punctuation omitted; emphasis supplied).

[14] See also *McDonald v. United States*, 335 U. S. 451, 452, 456 (69 SCt 191, 93 LEd 153) (1948) (Police officers conducted an illegal, warrantless search of the room McDonald was renting in a boarding house and seized allegedly illegal items that belonged to him. He and his guest were arrested as a result of the search, were

(c) Moreover, we conclude that the illegality of the traffic stop in this case is not cured by the fact that the officer who conducted the traffic stop of Jalim's truck testified that, while he was following and preparing to stop the truck, he observed that one of the truck's brake lights was not operating and that it was improperly displaying an expired, paper "drive-out" tag.[15] The officer testified that he had been told to follow and stop the truck by the BOLO alert and the officers who were monitoring the truck's GPS signals and that, without such instructions, he probably would not have had any contact with the truck or its occupants that night. Further, he specifically admitted that he intentionally postponed the traffic stop and followed the truck for several miles while waiting for backup officers to arrive, but he offered no explanation as to why this would have been necessary if he was simply making a routine stop based upon a minor, non-moving traffic violation. In addition, the officer

---

jointly tried, and were parties to the appeal. After concluding that the trial court erred in failing to suppress the evidence seized as a result of the illegal search, the Supreme Court of the United States held that such failure was prejudicial to both McDonald *and* his guest, noting that if the evidence had been properly suppressed, it would have been unavailable for the State to use against either defendant at trial. Thus, the Court reversed both defendants' convictions.).

[15] See generally *McBee v. State*, 296 Ga. App. 42, 44 (1) (673 SE2d 569) (2009) (holding that, even if an officer has an ulterior motive that does not authorize him to conduct a traffic stop of a particular vehicle, he may still lawfully execute the stop if he observes the driver violate a traffic law).

23

testified that his superior officer had instructed him to take the appellants and the other passenger into custody as part of the investigation of a possible burglary at the Rebel Trail house, even though there was no evidence at that time that a crime had been committed there.

Moreover, the police sergeant who directed the officer to conduct the traffic stop testified at trial that, *even though he had not seen Jalim break any laws and he did not know if anything illegal had even occurred at the house on Rebel Trail that night*, he ordered the traffic stop anyway because, in his opinion, "there was definitely some very suspicious activity going on, and we wanted to investigate it." He clarified that the "suspicious activity" to which he was referring was based *solely* upon the GPS signals from the truck showing that it had stopped at the Rebel Trail house in Sandy Springs at around 9:30 in the evening, adding that, sometime after the truck had left the residence and police officers were already following it pursuant to the BOLO alert, the house's alarm system was activated.[16] According to the sergeant, the

---

[16] The record shows that, after Jalim's truck had left the area, an officer was dispatched to the house on Rebel Trail to do a security check on the house. By the time he arrived, Jalim's truck was already being followed by police officers. According to the officer who had been dispatched to check on the house, the house's alarm was not sounding when he arrived and there were no signs of a forced entry. When he opened an unlocked door to further investigate, however, he activated the house's alarm, which was reported to the officers who were tracking the GPS signals

24

fact that Jalim had stopped at the house was suspicious to him because, *even though he did not know who resided at that address or if the resident was a friend or relative of the appellants, he could not think of any "legal" reason for Jalim to go to a Sandy Springs residence at night, noting that Jalim lived in Smyrna.* He also testified that, solely as a result of these concerns, he decided to order the traffic stop of Jalim's truck so officers could investigate what, *if anything*, had taken place at the Rebel Trail house. Thus, the overwhelming and undisputed evidence shows that the traffic stop of Jalim's truck would not have occurred but for the State's illegal use of the GPS tracking device.

2. Because we have held in Division 1, supra, that the evidence seized as a result of the illegal use of the GPS device was inadmissible at trial, and because the only proof offered by the State to support the appellants' burglary and possession of tools convictions was that evidence, it necessarily follows that there was insufficient evidence for a rational trier of fact to find either of them guilty beyond a reasonable doubt of those offenses, and those convictions must be reversed.[17] *Brown v. State*, 293

---

from Jalim's truck, as well as the officer who was following the truck. The stop occurred a few minutes later.

[17] Although Jalim did not directly challenge the sufficiency of the evidence for his convictions on appeal, we address the sufficiency issue because "[e]very person

25

Ga. App. 564, 567 (2) (a) (667 SE2d 410) (2008); *Rucker v. State*, 276 Ga. App. 683, 685 (2) (624 SE2d 259) (2005); *Mercer v. State*, 251 Ga. App. 465, 469 (3) (554 SE2d 732) (2001).

As for Jalim's remaining convictions for improper tag display and failure to have operational brake lights, we conclude that the evidence presented to prove those offenses was both admissible and sufficient to support those convictions, and they are affirmed.

3. Pursuant to our decisions in Divisions 1 and 2, supra, the appellants' remaining enumerations of error have been rendered moot.

*Judgment reversed in Case No. A13A0474. Judgment affirmed in part and reversed in part in Case No. A13A0882. Phipps, C. J., Barnes, P. J., and Miller, J., concur. Andrews, P. J., Ray and Branch, JJ., dissent.*

---

is presumed innocent until proved guilty. No person shall be convicted of a crime unless each element of such crime is proved beyond a reasonable doubt." OCGA § 16-1-5. See also *Garza v. State*, 284 Ga. 696, 704 (3), n. 7 (670 SE2d 73) (2008) ("Because due process requires the existence of sufficient evidence as to every element of the crime of which a defendant is convicted, the fact that this issue was not explicitly raised [on appeal] does not prevent us from addressing (nor, more importantly, does it justify a refusal to address) the issue at this juncture.") (citations omitted).

A13A0474.  HAMLETT v. THE STATE.
A13A0882.  HAMLETT v. THE STATE.


BRANCH, Judge, dissenting.

I respectfully dissent because I find that the presiding judge of the Superior Court of Cobb County, the judicial officer who made the decision to grant the warrant, had a substantial basis for concluding that probable cause existed to issue the order allowing installation of a GPS device on Jalim Hamlett's truck. The facts contained in the sworn affidavit submitted as a part of the application for the GPS device order were sufficient for the judge to conclude that there was a fair probability that contraband or evidence of a crime would be discovered as a result of monitoring the movements of Hamlett's truck.

1. (a) Our Supreme Court has reiterated the well-established role of the judicial officer issuing the warrant:

1

A search warrant will only issue upon facts sufficient to show probable cause that a crime is being committed or has been committed. The [judicial officer's] task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, *there is a fair probability that contraband or evidence of a crime will be found in a particular place*.

*State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009) (emphasis supplied). A trial court addressing a motion to suppress performs a "first level of review, guided by the Fourth Amendment's strong preference for searches conducted pursuant to a warrant" and giving "substantial deference" to the judicial officer's decision. Id. Moreover,

Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

Id. at 77-78. Appellate courts have a duty "to determine if the [judicial officer] had a 'substantial basis' for concluding that probable cause existed to issue the search warrant." Id. In so doing, we must remember that the judicial officer's decision "is entitled to substantial deference"; we must also uphold the trial court's findings of fact unless clearly erroneous. Id. at 78. Finally, appellate review of the validity of a

2

warrant must look to the totality of the circumstances because "probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (III) (103 SCt 2317, 76 LE2d 527) (1983).

Here, the affidavit prepared by Officer Duncan on August 18, 2010 in support of the application for an order allowing installation of the GPS device on Jalim Hamlett's truck states that Duncan was an officer with nearly 18 years of experience in law enforcement with the City of Atlanta Police Department and that he was then assigned to the Fulton County Multi-Jurisdiction Burglary Task Force, which was investigating burglaries in the metropolitan area. Duncan averred that an investigation of a January 2010 burglary showed that Jalim Hamlett and an accomplice sold to a surplus building supply business three dishwashers that had been stolen in a burglary and that Fulton County therefore had issued arrest warrants for Hamlett and his accomplice. Duncan averred that on August 5, 2010, a resident of Northside Drive in Sandy Springs reported a burglary and theft of a television, computers, and jewelry from his home. On the following evening, the Northside Drive victim again contacted the police to report that

an unknown black male knocked at [the victim's] door and appeared startled when the victim answered. The black male inquired with the victim about grass cutting. It was approximately 8:00 PM and raining at this time. The black male left on foot as the victim followed in his vehicle. The victim reported that the black male entered a pick up truck as a passenger, driven by an unknown person. The victim followed the pick up truck and obtained [the Georgia tag number].

Duncan averred that the tag number proved to be registered to Jalim Basheer Hamlett of Smyrna on a 1998 GMC Sierra pickup truck, which, it was determined was located at Hamlett's address in Smyrna at the time. Duncan concluded his affidavit by stating that he believed Hamlett and other unknown accomplices were involved in burglaries in the Atlanta metro area, and he requested authorization from the court to install and monitor a GPS signaling devise on the truck "to assist in surveillance of the vehicle and its occupants in efforts to identify accomplices and possible fencing locations of stolen goods and lead Police to the arrest of Jalim Basheer Hamlett."

Duncan applied to the Superior Court of Cobb County[1] for the GPS tracking order and the matter was considered by the presiding judge. The judge held that, based on the affidavit, probable cause existed to believe that Hamlet and unknown others had committed the crimes of burglary, theft by taking, and theft by receiving; that the subject vehicle would be used by Hamlet and others as their means of transportation, including for illegal activity; and that relevant information such as the location of the subject vehicle would be obtained by the use of a tracking device that will be material and relevant to the ongoing investigation.

The presiding judge had a substantial basis for concluding that probable cause existed to issue an order allowing the GPS device to be placed on Hamlet's truck. Duncan presented the judge with some evidence linking Hamlet to two burglaries: in one Hamlet sold stolen merchandise; in the other two men in Hamlet's truck appeared at the scene of a burglary the following night under suspicious circumstances. An officer is authorized to make reasonable inferences from the gathered facts when concluding that there is fair probability that warrant will lead to discovery of evidence

---

[1] Duncan testified that Hamlett's residence and the address listed on his truck registration was located in Smyrna, Cobb County, that the two burglaries referred to in the affidavit occurred in Fulton County, but that Duncan sought the warrant in Cobb County because of the location of the truck, which he confirmed was located in Cobb County.

of a crime. See generally *Marlow v. State*, 288 Ga. 769, 770 (2) (707 SE2d 95) (2011). With regard to the earlier burglary, the officer was allowed to infer that Hamlett would need a truck to move three dishwashers and that he might use his personal truck to do so. With regard to the later burglary, the officer was allowed to infer that Hamlet was one of the two men who drove in Hamlett's truck away from the house that had been burglarized the day before and who appeared at that same house under suspicious circumstances, which leads to an inference that Hamlett returned to the scene to consider an additional burglary. And both incidents involved the theft of appliances. Altogether, the officer was authorized to conclude, as he did in the affidavit, that Hamlett and other unknown accomplices were involved in a series of ongoing burglaries using Hamlett's truck.

These facts and reasonable inferences combine to form a reasonable basis for the officer to conclude that there was a fair probability that contraband or evidence of a crime would be discovered as a result of monitoring the movements of Hamlett's truck. Thus, after giving substantial deference to the presiding judge's decision to grant the warrant and considering the strong preference for searches conducted pursuant to a warrant, it is clear that the judge had a 'substantial basis' for concluding

that probable cause existed in this case to issue the order authorizing a GPS tracking device to be attached to Hamlett's truck.

(b) None of the evidence presented at the hearing on Hamlett's motion to suppress was sufficient to undermine the validity of the affidavit. In this case, although it was the State's burden to prove the lawfulness of the warrant, the burden of producing evidence to challenge the validity of the warrant shifted to Hamlett once the State produced the warrant and the supporting affidavit establishing probable cause:

> Although the burden of proving the lawfulness of a warrant is upon the State, and that burden never shifts to the defendant, when a motion to suppress is made on one of the three statutory grounds enumerated in OCGA § 17–5–30 (a) (2)[2] . . . , the State satisfies its initial burden by production of the warrant and its supporting affidavit, and by showing either by those documents or by other evidence that the warrant is not subject to the statutory challenge alleged. The burden of production then shifts to the defendant to produce evidence to support his challenge.

---

[2] OCGA § 17-5-30 (a) (2) provides that a defendant may challenge a warrant on the grounds that "[t]he search and seizure with a warrant was illegal because the warrant is insufficient on its face, there was not probable cause for the issuance of the warrant, or the warrant was illegally executed."

7

*Jones v. State*, 292 Ga. 656, 664-665, n.13 (740 SE2d 590) (2013) (citations and punctuation omitted). See also *Watts v. State*, 274 Ga. 373, 375 (2) (552 SE2d 823) (2001).

The majority contends five items of evidence support its conclusion that the detective's affidavit failed to provide a sufficient basis from which the Cobb County court could find probable case sufficient to authorize the warrant: (1) that Officer Duncan admitted that at the time he executed the affidavit, there was no evidence that Jalim had been involved in the "actual burglary of the business in January 2010" nor evidence that his truck had been used in that burglary; (2) that he admitted that there was no evidence that either Jalim or his truck had been at the scene of the August 5 burglary on Northside Drive; (3) and that the Northside Drive victim never identified the man who came to his home on the day after the burglary as either of the appellants; (4) that it is undisputed that the man who approached the Northside Drive homeowner on the day after that burglary "committed no crime" that day; and (5) that although the affidavit asserted that the GPS device could lead to Hamlett's arrest, the officers already had a seven-month old arrest warrant for him.

What the majority has done is selected a handful of facts, construed them in favor of the appellant, disallowed all reasonable inferences that can be drawn from

8

the facts in the affidavit, failed to recognize the objective of the warrant, and failed to give substantial deference to the superior court judge's decision to grant the warrant.

Most importantly, the majority fails to recognize that the objective of the warrant was not to solve either crime or simply to arrest Hamlett but to identify accomplices and possible fencing locations of stolen goods and lead police to the arrest of Jalim Basheer Hamlett for, potentially, two or more burglaries. A reasonable person, and especially an officer with 18 years of experience who works for a multi-jurisdiction burglary task force, can reasonably infer from the objective facts that Hamlett was not just a suspect for receiving or selling stolen goods in connection with the January 2010 incident, but that he might in fact be the burglar and might have needed his truck to transport three dishwashers. Then after becoming a suspect in that incident, the suspicious activity of two men in Hamlett's truck knocking on the door of a home that had just been burglarized the night before, is a basis for inferring that Hamlett could be suspect in that burglary as well. In addition, other persons appeared to be involved in both incidents. In short, none of the facts cited by the majority, either separately or collectively, undermine the facts presented by Officer

Duncan in the affidavit nor undermine the presiding judge's determination that probable cause to issue the warrant existed.

> [A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A [judicial officer's] determination of probable cause should be paid great deference by reviewing courts. A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant[, and] courts should not invalidate . . . warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner.

*Illinois v. Gates*, 462 U.S. at 236 (III) (citations and punctuation omitted.)

(c) The majority's single citation of precedent in support of its conclusion that the affidavit was insufficient is distinguishable, both on the facts and on the law.

In *State v. Brantley*, 264 Ga. App. 152 (589 SE2d 716) (2003), two people were struck by gunshots from a white van on October 14, 2001, and one victim identified Brantley as the driver of the van, which had been rented in Brantley's name with a Michigan address. Id. at 153. The abandoned van was recovered along with a gun found therein, and an arrest warrant was issued for Brantley. Id. Two months later, an informant told police that Brantley was back in town and believed to be staying at a townhouse owned by his brother. Id. After observing Brantley at that location,

10

officers placed the house under surveillance and sought a warrant to search the townhouse for evidence related to the shooting that occurred two months earlier. Id. This Court affirmed the trial court's decision, which was based on undisputed evidence, to suppress the evidence obtained in the ensuing search of the townhouse because there was no evidence linking the townhouse to the earlier crime:

> There was no evidence presented that Brantley lived at the townhouse before or during the time the crime occurred. There was no evidence that he may have visited the townhouse at some point in October when the crime occurred.

Id. This Court found that the evidence of the shootings was stale with regard to the possibility of finding evidence at Brantley's brother's townhouse two months later. Id.

Thus in *Brantley*, the officers were investigating a single crime and were attempting to search a townhouse that had no connection with that two-month-old crime other than that the defendant was seen at that location. At the time Duncan prepared the affidavit in the present case, there were already two unsolved burglaries that appeared to be connected to Hamlett and his truck, and

> when the sworn testimony indicates the existence of an ongoing activity, the passage of time becomes less significant than would be the case with a single, isolated transaction.

*Lewis v. State*, 255 Ga. 101, 104-105 (335 SE2d 560) (1985). See also *State v. Luck*, 252 Ga. 347 (312 SE2d 791) (1984) (the determination of staleness is included in the totality of circumstances). In the present case, the two separate burglaries that occurred seven months apart, both of which were linked to Hamlett, were being investigated by an officer working for the Multi-Jurisdiction Burglary Task Force. The information about the January 2010 incident was therefore relevant to an effort to determine if Hamlett and others were involved in a series of burglaries, and, therefore, *Brantley* is distinguishable.

(d) Jalim Hamlett also contends that the Cobb County court was not authorized to issue a GPS tracking warrant that allowed officers located in another county to track his truck outside of Cobb County. But Hamlett has provided no applicable authority to support his argument. Hamlett relies solely on *Luangkhot v. State*, 292 Ga. 423 (736 SE2d 397) (2013). In *Luangkhot*, the Supreme Court interpreted the Georgia wiretap statute, OCGA § 16–11–64, which incorporates by reference the "terms, conditions, and procedures provided for by" the federal wiretap statute, and

12

determined that based on federal statute and case law, "superior courts do not currently possess the authority to issue wiretap warrants for interceptions conducted outside the boundaries of their respective judicial circuits." Id. Hamlett has not shown that either the Georgia or federal wiretap statutes apply to GPS tracking devices. See generally *United States v. Jones*, _ U. S. _ (132 SCt 945, 181 LE2d 911) (2012) ("To date, however, Congress and most States have not enacted statutes regulating the use of GPS tracking technology for law enforcement purposes. The best that we can do in this case is to apply existing Fourth Amendment doctrine and to ask whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated.") (Alito, concurring in judgment). Thus, Hamlett has no authority to support his contention and we find none; this contention of error is therefore without merit.

Jalim Hamlett having made no other assertion of error in connection with the use of the GPS device or the initiation of the traffic stop, I would conclude that the officer making the traffic stop was authorized do so by the observed traffic violations and by the information that the truck was involved in an ongoing burglary investigation.

2. Salim and Jalim Hamlett also contend that the trial court erred by denying their motion to suppress because they were unreasonably detained in violation of their constitutional rights after the officers stopped the truck. They argue that the officers continued to detain them after the conclusion of the traffic stop for four hours without reasonable suspicion of criminal activity before they were formally arrested. There is no merit to this enumeration and therefore the decision of the trial court judge to deny the motion to suppress should be upheld.

Following the hearing on the defendants' motion to suppress, the trial court found the State's witnesses credible and the State's evidence material and relevant. The defense offered no evidence other than the cross-examination of the State's witnesses. "[W]here the evidence is uncontroverted and no question regarding the credibility of witnesses is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review. [Cits.]" *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

With regard to Jalim Hamlett, the officers already had a warrant for his arrest in connection with the January 2010 incident, and Hamlett does not challenge the validity of that arrest warrant. Accordingly, the officers had probable cause to arrest Jalim Hamlett at the time they stopped him in his truck. Jalim Hamlett's detention

14

was therefore supported by probable cause, and he can show no possible unreasonable detention.

With regard to both Hamletts, as shown below, at or shortly after the time the officers stopped the truck, they had all of the information detailed in Division 1 as well as information that the truck might have been used in an additional burglary that night. Based on that information, the officers therefore had probable cause to arrest both Hamletts at or shortly after the time of the traffic stop, well before they were formally arrested. The trial court found no unreasonable detention. The trial court's order is correct and, accordingly, I would conclude that the Hamletts were not unreasonably detained without probable cause.

The facts show that on August 30, 2010, Officer Duncan and Officer Levy became aware that the GPS tracking information showed that Hamlett's truck stopped in the vicinity of 5000 Rebel Trail in Sandy Springs for 28 minutes. Levy issued a BOLO (be on the lookout) on the truck and dispatched officers to the address. Officer Beran was sent to investigate the Rebel Trail address in response to an alarm at the location and information about the presence of Hamlett's truck in the vicinity. No one was home when Beran arrived at 9:53 p.m., but Beran found two unlocked doors at the rear of the house and an open door inside the garage. Beran then opened a rear

door and the house alarm went off for a second time. After another officer arrived, Beran entered the house and saw that it had been ransacked. Beran stayed at the house for three and a half hours until the owner, who had been in Macon, arrived.

While on patrol, Officer Jonathan Williams of the Sandy Springs Police Department heard the BOLO on the truck and learned that it was being tracked and that it was located in the 5000 block of Rebel Trail in Sandy Springs. Williams continued to receive radio updates on the location of the truck, which had begun to move, as he attempted to, and eventually did, intercept it. Williams also noticed that a brake light was out and that the truck had a an improperly affixed and out of date drive-out tag. At about 9:53 or 9:54 p.m., during the pursuit, Williams received information that an alarm went off at 5000 Rebel Trail.

Levy made the decision to stop the truck and apparently communicated that decision to Williams. After allowing back up officers to catch up, Williams made the traffic stop at approximately 9:55 to 9:57 p.m. based on the traffic violations and the notice that the truck was being tracked by other officers. After the stop, Williams observed items in plain view in the bed of the truck including a hand truck, boxes of exterior home lights, hedge clippers, a roll of duct tape. Officers took the Hamletts and Kareem El-Amin into custody and to the police department about 30 to 35

16

minutes after the stop. The Hamletts and El-Amin were in custody for investigation purposes at that point in time; they were handcuffed and not free to leave. A search of the interior of the truck incident to arrest revealed gloves, a jewelry box, a head lamp, and a crowbar.

Thus, at the time of the traffic stop, the officers had probable cause to believe that the truck was used in the third of on ongoing series of burglaries in Sandy Springs. With regard to the third incident, the officers knew at the time of the traffic stop that an alarm had gone off at 5000 Rebel Trail, that the house had been ransacked, that Hamlett's truck was in the vicinity of that house for 28 minutes leading up to the time of the alarm; and that the truck contained items that could have been taken from the Rebel Trail house. This information together with the information presented in the warrant affidavit was sufficient to establish probable cause to stop and detain the men in the truck for suspicion of having committed burglary.

I am authorized to state that Andrews, P. J., and Ray, J., join in this dissent.